**[Cite as *State v. Hartley*, 2026-Ohio-642.]**

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| | |
|---|---|
| STATE OF OHIO | C.A. No. 31329 |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| RAYMOND HARTLEY | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR-2024-03-0874 |

DECISION AND JOURNAL ENTRY

Dated: February 25, 2026

CARR, Presiding Judge.

{¶1}    Appellant, Raymond Hartley, appeals the judgment of the Summit County Court of Common Pleas.  This Court affirms.

I.

{¶2}    On the evening of February 27, 2024, T.C. drove to the house of his friend, Amber Weaver, who lives in Tallmadge.  Weaver was working the night shift that evening and she had arranged for T.C. to spend the night and care for her children.  During the middle of the night, a man walked into the bedroom where T.C. was sleeping and struck him in the head.  When Weaver returned home, she found Hartley sleeping on the couch while a badly injured T.C. remained in the bedroom.

{¶3}    Following an investigation by Tallmadge police, the Summit County Grand Jury returned an indictment charging Hartley with one count of felonious assault and one count of aggravated burglary.  Hartley pleaded not guilty to the charge at arraignment, and the matter

proceeded to a jury trial. The trial court gave jury instructions on felonious assault and aggravated burglary, as well as the lesser included offenses of assault and criminal trespass. The jury found Hartley guilty of felonious assault, but not guilty of aggravated burglary and the lesser included offense of criminal trespass. The trial court imposed a sentence of two to three years imprisonment.

{¶4} On appeal, Hartley raises four assignments of error. This Court consolidates certain assignments of error to facilitate review.

II.

### ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED BY DENYING MR. HARTLEY'S [CRIM.R.] 29 MOTION FOR ACQUITTAL.

### ASSIGNMENT OF ERROR II

THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE TO SUSTAIN A CONVICTION.

{¶5} In his first assignment of error, Hartley contends that the trial court erred by denying his motion for a judgment of acquittal on the felonious assault charge. In his second assignment of error, Hartley argues that the State failed to present sufficient evidence to sustain his conviction for felonious assault.[1] This Court disagrees with both assertions.

{¶6} Crim.R. 29(A) provides, in relevant part:

The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses. The court may not reserve ruling on a motion for judgment of acquittal made at the close of the state's case.

---

[1] As Hartley combined his first and second assignments of error in his merit brief, this Court also joins those assignments of error.

{¶7} When reviewing the sufficiency of the evidence, this Court must review the evidence in a light most favorable to the prosecution to determine whether the evidence before the trial court was sufficient to sustain a conviction. *State v. Jenks*, 61 Ohio St.3d 259, 279 (1991).

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id*. at paragraph two of the syllabus.

{¶8} Hartley was convicted of one count of felonious assault in violation of R.C. 2903.11(A)(1), which states, "[n]o person shall knowingly . . . [c]ause serious physical harm to another[.]" R.C. 2903.11(D)(1)(a) further provides that "[w]hoever violates this section is guilty of felonious assault. Except as otherwise provided[,] . . . felonious assault is a felony of the second degree." Hartley's challenge to the sufficiency of the evidence focuses on whether this case involved serious physical harm. R.C. 2901.01(A)(5) defines "[s]erious physical harm to persons" as any of the following:

> (a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;
>
> (b) Any physical harm that carries a substantial risk of death;
>
> (c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;
>
> (d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;
>
> (e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

Background

**{¶9}** During its case-in-chief, the State presented evidence in support of the following narrative. Weaver is a single mother of four children. Weaver works as a manager at a developmental disability agency that provides home healthcare services. Because Weaver was working the night shift on the evening of February 27, 2024, she made arrangements for her friend, T.C., to stay the night at her house and watch her two youngest children, both of whom are boys. When Weaver returned home after her shift on the morning of February 28, 2024, she was surprised to find her cousin, Hartley, sleeping on the couch. Weaver testified that while Hartley had visited the house previously, he was not supposed to be in the house at that time. Weaver explained that Hartley's relationship with T.C. was "[n]ot good." Weaver walked into the bedroom and found that T.C. was "badly injured[.]" T.C. was in a pool of blood and his face was battered. When T.C. indicated that Hartley had caused the injuries, Weaver woke up Hartley, who appeared to be intoxicated. Weaver asked Hartley to get in her car, and she drove him to his mother's house. Weaver then returned to her house and called 9-1-1. After making a report to police and then attempting to find alternate childcare arrangements, Weaver drove T.C. to the hospital.

**{¶10}** At trial, T.C. explained that Weaver had arranged for him to be at her house to receive her two boys from another babysitter early in the morning on February 28, 2024. With Weaver's permission, T.C. arrived the night before to ensure that there would not be any traffic issues the following morning. After texting Weaver around 10:00 p.m. to let her know that he had arrived, T.C. fell asleep in Weaver's bedroom. T.C. testified that he was suddenly awoken in the middle of the night when Hartley punched him in the face. After some initial confusion as to why Hartley was in the bedroom, T.C. explained that he "faded out pretty quick[ly]" after being punched. T.C. further testified that there was "a lot of blood" and that he had "a pretty bad cut to

[his] eyebrow[.]" T.C. experienced facial numbness immediately after being punched. Still lying in bed, T.C. turned away from Hartley before losing consciousness. When Weaver woke up T.C. the following morning, T.C. was "very fuzzy" and "completely out of it." T.C.'s eye was nearly swollen shut and he was in a great deal of pain.

{¶11} Before going to the hospital, Weaver called the police and Officer Collin Hefner responded to the scene. Officer Hefner testified that it looked like T.C. "had been severely beaten [] on the left side of his face." Officer Hefner noted that "the whites of [T.C.'s] eye appeared to be filled with blood." In addition to taking the report, Officer Hefner advised T.C. to go to the hospital, given that his injuries were significant. T.C. underwent a CT scan upon arriving at the hospital. T.C. was diagnosed with a concussion. T.C. also suffered a chipped tooth. At trial, the State introduced photographs depicting the extent of T.C.'s injuries. The photographs showed deep cuts to T.C.'s eyebrow, significant swelling on the left side T.C.'s face, as well as severe redness in T.C.'s left eye. T.C. testified that he experienced blurred vision for a period after the incident and that it "took [] a good two to three months for everything to get back to half normal[.]"

## Discussion

{¶12} In support of his first and second assignments of error, Hartley asserts that "[w]hile [he] does not dispute that he caused physical harm to T.C., he submits that the testimony and evidence presented clearly demonstrated that the injuries inflicted did not result in 'serious physical harm' to T.C." Hartley stresses that T.C.'s concussion diagnosis was a clinical diagnosis and that the emergency room physician did not feel that it was necessary to refer T.C. to a neurologist. Hartley further highlights that this case did not involve a weapon and that T.C. declined treatment in the emergency room for the cuts on his face.

{¶13} Under these circumstances, Hartley's sufficiency challenge is without merit. "Serious physical harm" is defined under R.C. 2901.01(A)(5)(c), (d), and (e) as harm that results in the victim experiencing "temporary, substantial incapacity[,]" "temporary, serious disfigurement[,]" or "acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain." "The degree of harm that rises to the level of 'serious' physical harm is not an exact science, particularly when the definition includes such terms as 'substantial,' 'temporary,' 'acute,' and 'prolonged.'" (Citations omitted.) *State v. Mango*, 2016-Ohio-2935, ¶ 33 (8th Dist.). To the extent that Hartley downplays the level of treatment that T.C. received at the emergency room, this Court is mindful that we must construe the evidence in the light most favorable to the prosecution in resolving a sufficiency challenge. *Jenks*, 61 Ohio St.3d at 279. Hartley punched T.C. while T.C. was defenseless in his sleep, and T.C. awoke only briefly before quickly losing consciousness. The next morning, Weaver found T.C. in a pool of his own blood, having suffered severe lacerations and swelling on the left side of his face, as well as a chipped tooth. T.C. remained dazed at that time and he was subsequently diagnosed with a concussion. T.C. also experienced blurred vision for several months after the assault. This evidence, when construed in the light most favorable to the State, was sufficient to establish that Hartley's attack resulted in serious physical harm to T.C.

{¶14} The first and second assignments of error are overruled.

### ASSIGNMENT OF ERROR III

MR. HARTLEY'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT
OF THE EVIDENCE.

{¶15} In his third assignment of error, Hartley argues that his felonious assault conviction was against the weight of the evidence. This Court disagrees.

{¶16}   A conviction that is supported by sufficient evidence may still be found to be against the weight of the evidence.  *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist. 1986).  An appellate court should exercise the power to reverse a judgment as against the manifest weight of the evidence only in exceptional cases.  *Id.*

{¶17}   Focusing largely on the details of T.C.'s emergency room visit,  Hartley argues that the weight of the evidence does not support the conclusion that T.C. suffered serious physical harm.  Hartley stresses that T.C. did not seek medical treatment for roughly 12 to 14 hours after the attack and that the level of care that T.C. received in the emergency room was not consistent with suffering serious physical harm.

{¶18}   As discussed above, T.C. lost consciousness after being struck by Hartley in the middle of the night.  When Weaver found T.C. the following morning, T.C. was covered in blood and he remained "very much still out of it."  Weaver took measures to drive Hartley to a separate location prior to returning to her house and calling the police to report the incident.  After making a police report, Weaver had difficulty making alternate childcare arrangements before she could drive T.C. to the hospital.  By the time Weaver and T.C. arrived at the emergency room at Akron City Hospital, it was approximately 5:00 pm on February 28, 2024.

{¶19}   At trial, the State presented the testimony of Dr. Brigid McCulloch, the attending physician in the emergency room who treated T.C.  Dr. McCulloch testified that the assault on T.C. resulted in ecchymosis around the left eye, jaw pain, and a subconjunctival hemorrhage,

which is the burst of the blood vessels in the eye. T.C. also suffered a chipped tooth and a laceration above the eyebrow. Based on T.C.'s condition, Dr. McCulloch ordered a CT scan, based in part out of concern that T.C. had suffered a facial fracture. Dr. McCulloch testified that the radiologist's interpretation of the CT scan revealed significant soft tissue swelling but the medical team was able to rule out intercranial bleeding or a facial fracture. Dr. McCulloch diagnosed T.C. with a concussion and instructed him to return if his symptoms worsened. Dr. McCulloch testified that a concussion is a traumatic brain injury and it is typically subject to a clinical diagnosis. Dr. McColloch further explained that recovery from a concussion can take a period of days or months, depending on the severity of the injury. While Dr. McCulloch also offered T.C. laceration wash out and repair, T.C. expressed a preference to treat the wound at home.

{¶20} On cross-examination, defense counsel inquired as to whether Dr. McColloch directed T.C. to see a neurologist. Dr. McColloch answered in the negative based on her review of her records. Dr. McColloch explained that she instructed T.C. to seek medical attention if his concussion symptoms intensified because that could signify the worsening of a traumatic brain injury. The trial court also permitted the jury to ask several questions. Regarding the timeframe of events, Dr. McColloch testified that T.C. reported that the injury occurred overnight while he was sleeping and that the triage process in the emergency room started at 5:53 p.m. on February 28, 2024. T.C. was discharged at 10:16 p.m. With respect to the timeframe for recovery, Dr. McColloch testified that a subconjunctival hemorrhage typically does not result in permanent damage to the eye. Dr. McColloch noted, however, that a concussion can result in lingering vision issues.

{¶21} A careful review of the record reveals that Hartley's conviction did not result in a manifest miscarriage of justice. While Hartley attempts to downplay T.C.'s injuries by

underscoring that T.C. did not immediately seek medical attention, the State presented evidence regarding the sequence of events that caused the delay. Namely, T.C. was unconscious for a period of time following the incident and Weaver first removed Hartley from her home, called the police, and sought to make childcare arrangements prior to driving T.C. to the hospital. Furthermore, Dr. McColloch explained that a clinical diagnosis of a concussion is common practice and that, in the case of a severe concussion, symptoms could last for months. Accordingly, the fact T.C. was not referred to a neurologist does not negate the other evidence regarding the severity of his injuries. T.C. testified that he experienced blurred vision for a prolonged period of time following the incident and that it was two or three months before he began to feel normal. Under the circumstances presented here, Hartley has not demonstrated that this is the exceptional case where the jury clearly lost its way. *Otten*, 33 Ohio App.3d at 340.

{¶22} Hartley's third assignment of error is overruled.

## ASSIGNMENT OF ERROR IV

MR. HARTLEY WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL.

{¶23} In his fourth assignment of error, Hartley argues that trial counsel rendered ineffective assistance by failing to request that the trial court give a jury instruction on the offense of aggravated assault. This Court disagrees.

{¶24} To prevail on a claim of ineffective assistance of counsel, Hartley must show that "counsel's performance fell below an objective standard of reasonableness and that prejudice arose from counsel's performance." *State v. Reynolds*, 80 Ohio St.3d 670, 674 (1998), citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984). First, Hartley must show that counsel's performance was objectively deficient by producing evidence that counsel acted unreasonably. *State v. Keith*, 79 Ohio St.3d 514, 534 (1997), citing *Strickland* at 687. Second, he must demonstrate that but for

counsel's errors, there is a reasonable probability that the results of the trial would have been different. *Keith* at 534. "This Court need not address both prongs of the *Strickland* test if the appellant fails to satisfy either prong." *State v. Gannon*, 2020-Ohio-3075, ¶ 23 (9th Dist.), citing *State v. Ray*, 2005-Ohio-4941, ¶ 10 (9th Dist.).

{¶25} During a break in the State's case-in-chief, defense counsel raised the prospect of requesting an alternative jury instruction on aggravated assault. The parties debated the issue, and the State ultimately presented case law indicating that an aggravated assault instruction would not be appropriate. Upon reviewing the case law, the trial court agreed with the State and indicated that an aggravated assault instruction was "off the table." At that point, defense counsel acknowledged that the case law presented by the State was "dispositive" and, in the alternative, lobbied for an instruction on misdemeanor assault. The State indicated that it had no objection to a misdemeanor assault instruction.

{¶26} On appeal, Hartley maintains that defense counsel rendered ineffective assistance by failing to renew his request for an aggravated assault jury instruction at the close of the evidence, in light of the testimony that T.C. tended to "nitpick" Hartley and that the two men did not have a good relationship. Hartley maintains that if defense counsel had requested the aggravated assault instruction, Hartley would have been convicted of a fourth-degree offense as opposed to second-degree felonious assault.

{¶27} Hartley's ineffective assistance argument is without merit. As discussed above, trial counsel raised the prospect of an aggravated assault jury instruction and the trial court ruled that such an instruction was "off the table." At that time, trial counsel pivoted and requested an instruction on misdemeanor assault, to which the trial court agreed. While Hartley now contends that trial counsel should have revisited the possibility of an aggravated assault jury instruction at

the close of the evidence, we are unpersuaded given that such an instruction would have been inappropriate in light of the well-settled precedent that aggravated assault is not a lesser-included offense of felonious assault. *See generally State v. Deem*, 40 Ohio St.3d 205, 210-211 (1988). Accordingly, as Hartley has not demonstrated that trial counsel's performance was objectively deficient, he cannot prevail on his ineffective assistance claim.

**{¶28}** Hartley's fourth assignment of error is overruled.

III.

**{¶29}** Hartley's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

FLAGG LANZINGER, J.
SUTTON, J.
CONCUR.

APPEARANCES:

JAMES K. REED, Attorney at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and C. RICHLEY RALEY, JR., Assistant Prosecuting Attorney, for Appellee.